UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHAWN M. LOSAT, et al.,

Plaintiffs,

v.                                      CASE NO.: 8:10-cv-1564-T-17TGW

GEICO CASUALTY COMPANY,

Defendant.

_____/

**ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court on Defendant's, GEICO CASUALTY COMPANY, Motion for Summary Judgment (Doc. 72). Plaintiff, SHAWN M. LOSAT, filed a response and Motion for Partial Summary Judgment (Doc. 73). For The reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's motion for Partial Summary Judgment is **DENIED**.

**BACKGROUND AND PROCEDURAL HISTORY**

Geico Casualty Company ("GEICO") issued an insurance policy to Raghunadh M. Lnu ("LNU") on December 30, 2008, which was effective through June 30, 2009. (Doc. 72, Exhibit "A"). This insurance policy provided bodily injury ("BI") coverage in the amount of $20,000.00 per person /$20,000.00 per occurrence, and property damage coverage in the amount of $20,000.00. (Doc. 72, Exhibit "A"). On January 18, 2009, LNU was involved in a motor vehicle accident with Shawn M. Losat ("LOSAT"). GEICO was promptly notified of LNU's accident and that LNU was cited by the police for failure to yield. (Doc. 72, Exhibit "C"). On

January 19, 2009, GEICO learned that the other driver was thrown from his motorcycle and life-flighted to the hospital from the accident scene. (Doc. 72, Exhibit "D"). On January 20, 2009, GEICO, contacted LNU seeking the police report number in order to obtain the report to determine the identity of the claimant. (Doc. 72, Exhibit "E"). On January 21, 2009, GEICO advised LNU of his $20,000.00 coverage limits, the possibility that his liability might exceed his coverage under the policy, and his right to retain an attorney at his own expense to defend his interests in excess of his policy limits. (Doc. 72, Exhibit "F"). On January 22, 2009, a GEICO field representative ("F.R.") conducted a review of the police call logs and then requested the names on the report from the Tampa Police Department. (Doc. 72, Exhibit "H"). The police department refused to release the names and did not release the full accident report containing the names until February 3, 2009. (Doc. 72, Exhibit "H").

On or about February 4, 2009, GEICO learned the name of claimant was LOSAT. On February 4, 2009, GEICO confirmed LOSAT was still at Tampa General Hospital and prepared a letter, release and an affidavit of coverage so GEICO's F.R. could tender LNU's $20,000.00 bodily injury policy limits. (Doc. 72, Exhibit "I"). GEICO's F.R. went to visit LOSAT at the hospital to tender LNU policy limits. At the hospital GEICO's F.R. was informed by Theresa Losat, whom the F.R. mistakenly believed was LOSAT's wife, that LOSAT was represented by Attorney Brian Gonzalez. (Doc. 72, Exhibit "J"). Thereafter, GEICO's F.R. went to Gonzalez's office with a revised cover letter explaining the meeting with Theresa Losat at the hospital, a revised proposed release including Theresa Losat as the wife of LOSAT, an affidavit of coverage for LNU's policy, and a $20,000.00 check payable to Shawn and Theresa Losat. (Doc. 72, Exhibit "K"). Upon arriving at Gonzalez's office, the GEICO F.R. was informed that LOSAT had not retained Gonzalez at that time.

On February 5, 2009, GEICO contacted LNU to inform him that the police report had been obtained and that a F.R. was attempting to settle the claim with LOSAT's attorney. (Doc. 72, Exhibit "L"). On February 6, 2009, Gonzalez contacted GEICO to inform them that LOSAT had signed representation papers and that we would be sending GEICO a letter of representation. (Doc. 72, Exhibit "M"). In response, GEICO's F.R. informed Gonzalez that GEICO'S tender of LNU's policy limits was ready and would have been delivered the day before had Gonzalez been available and formally retained by LOSAT. (Doc. 72, Exhibit "L"). Thereafter on February 6, 2009, Gonzalez informed GEICO that he and his client, LOSAT, were not ready to accept GEICO's tender offer of LNU's policy limits. (Doc. 72, Exhibit "L"). Gonzalez also informed GEICO that Theresa Losat was provided a copy of the letter of representation. Additionally, Gonzalez requested GEICO provide him with a sworn statement of coverage information within thirty (30) days and an additional affidavit from someone stating facts that show no other person or entity had pass-through liability for the accident. (Doc. 72, Exhibit "N").

On February 9, 2009, GEICO's F.R. returned to Gonzalez's office to tender LNU's policy limits but Gonzalez was not present. However, Gonzalez instructed his staff to not allow GEICO's F.R. to drop off a check. (Doc. 72, Exhibit "O"). Thereafter, GEICO sent Gonzalez a check payable to Shawn and Theresa Losat for the $20,000.00 policy limits, a proposed release including Theresa Losat as wife of Shawn Losat, and an affidavit of coverage via certified mail. (Doc. 72, Exhibit "O"). On February 10, 2009, GEICO sent a letter to LNU informing of GEICO's recent attempts to deliver the $20,000.00 policy limits to LOSAT's attorney. (Doc. 72, Exhibit "P"). On February 10, 2009, GEICO, in response to Gonzalez's request, provided Gonzalez with another affidavit of coverage and a certified copy of LNU's policy. (Doc. 72, Exhibit "Q"). GEICO additionally attempted to contact Gonzalez to determine what he meant by

"an affidavit from someone stating facts that show no other person or entity has pass-through liability for the accident." (Doc. 72, Exhibit "Q"). No facts indicate that Gonzalez responded to GEICO's request for clarification. On February 11, 2009, GEICO sent a letter to LNU updating him on the status of LOSAT's claim and advising him of the additional affidavit requested in Gonzalez's letter of representation and their efforts to comply with said request. (Doc. 72, Exhibit "R").

On February 11, 2009, GEICO sent a letter to Gonzalez referencing LOSAT's mistakenly assumed wife, and summarizing the efforts taken by GEICO to settle this claim for LNU's $20,000.00 policy limits. (Doc. 72, Exhibit "S"). This letter additionally advised Gonzalez that the original check made out to LOSAT and Theresa Losat could be re-issued to include Gonzalez's firm name if he so desired. (Doc. 72, Exhibit "S"). A copy of this correspondence was also sent to LNU on the same date. (Doc. 72, Exhibit "S"). On February 10, 12, and 16, 2009, Gonzalez requested the additional affidavit from GEICO. (Doc. 72, Exhibit "T"). On February 18, 2009, GEICO sent a letter to Gonzalez, and a copy of this letter to LNU, requesting clarification regarding the additional affidavit from "someone stating facts that show no other person or entity has pass-through liability for the accident." (Doc. 72, Exhibit "U"). Despite GEICO returning phone calls after Gonzalez's requests, GEICO did not receive any calls back nor did Gonzalez respond to GEICO's February 18, 2009 letter. On February 20, 2009, GEICO sent another letter to Gonzalez, along with a copy of an affidavit prepared by GEICO and provided to LNU, that invited Gonzalez to provide an alternative affidavit if the attached affidavit from GEICO was not sufficient for what Gonzalez had requested. (Doc. 72, Exhibit "V"). Gonzalez did not respond to the February 20, 2009 letter.

On March 4, 2009, GEICO provided Gonzalez with an affidavit signed by LNU stating that the $20,000.00 BI liability coverage provided by GEICO was the only insurance available and that LNU was not in the course and scope of his employment at the time of the accident. (Doc. 72, Exhibit "W"). On March 6, 2009, GEICO's F.R. met with LNU to secure a notarized affidavit. (Doc. 72, Exhibit "W"). On March 10, 2009, a signed and notarized copy of LNU's affidavit was provided to Gonzalez. (Doc. 72, Exhibit "X"). On March 11, 2009, GEICO called LNU to advise him that the affidavit has been sent to LOSAT's attorney and also called Gonzalez to confirm receipt of the affidavit and to inquire about obtaining a release. (Doc. 72, Exhibit "Y"). Gonzalez did not return GEICO's call. On March 18, 2009, GEICO called Gonzalez again and left a message seeking a return call regarding a proposed release and receipt of the executed affidavit from LNU. (Doc. 72, Exhibit "Y"). On March 19, 2009, Gonzalez faxed a letter to GEICO's F.R. informing her that Henry Valenzuela had taken over representation of LOSAT in regards to his claims against LNU. (Doc. 72, Exhibit "Z"). Thereafter, GEICO called Valenzuela and left a message requesting a call back and advising him that the check for $20,000.00 policy limits issued to Shawn and Theresa Losat could be re-issued to include Valenzuela's firm name. (Doc. 72, Exhibit "AA").

On March 27, 2009, GEICO called LNU and informed him that LOSAT had retained new counsel who was currently reviewing the file. (Doc. 72, Exhibit "BB"). On April 1, 2009, Henry Valenzuela called GEICO and inquired about where LNU was driving to before the accident. (Doc. 72, Exhibit "BB"). GEICO subsequently called Valenzuela back and left voicemails about investigating the matter. (Doc. 72, Exhibit "BB"). On April 14, 2009, GEICO learned from LNU that he was destined for the grocery store before the accident occurred, and later that day GEICO called Valenzuela and informed his assistant about this information. (Doc.

72, Exhibit "BB"). On April 28, 2009, GEICO contacted LNU and advised him that they were still waiting to hear from Valenzuela regarding settling LOSAT's BI claim. (Doc. 72, Exhibit "CC"). On April 30, 2009, GEICO received a settlement letter dated April 28, 2009, from Valenzuela. The demand later offered to settle the claim for the BI coverage LNU had under his policy and was based on strict compliance with three conditions:

> First, your delivery of timely and proper payment as discussed herein. Mr. Losat will deliver a release in favor of your insured, Raghunadh M. Lnu, only, for any claims for bodily injury and related damages arising out of the subject traffic accident. No other terms of any proposed release will be accepted any release proposing any varying terms will be viewed as a counteroffer and rejected. Second, the subject payment must be made payable to "Valenzuela & Stern, P.A., in trust for the benefit of Shawn Losat" and received by this office by no later than May 7, 2009, by 5:00 p.m. Time is of the essence. (Doc. 72, Exhibit "DD").

On May 4, 2009, after GEICO could not reach Valenzuela by phone, GEICO sent a response to Valenzuela that included a $20,000.00 check made out in the manner described in the demand, a proposed release in favor of LNU that included Theresa Losat as Shawn Losat's wife, and a cover letter advising Valenzuela that if the enclosed release were unacceptable, GEICO would use a release provided by Valenzuela. (Doc. 72, Exhibit "EE"). In GEICO's May 4, 2009 cover letter, GEICO also informed Valenzuela that if any aspect of the check or release was not reflecting the exact terms of Valenzuela's agreement to settle, GEICO would revise it to conform to Valenzuela's liking. (Doc. 72, Exhibit "EE"). On May 5, 2009, GEICO's F.R. delivered this response to Valenzuela and GEICO's F.R. was informed by Valenzuela's legal assistant that Valenzuela usually uses his own release and he may want to use it in this instance. (Doc. 72, Exhibit "FF"). On May 6, 2009, Valenzuela rejected GEICO's tender offer on the grounds GEICO committed "an act of bad faith insurance claims handling" by including Theresa Losat as Shawn Losat's wife on the proposed release. (Doc. 72, Exhibit "GG"). In Valenzuela's

rejection letter of May 6, 2009, he informed GEICO that Theresa Losat was LOSAT's mother, not his wife. (Doc. 72, Exhibit "FF"). Valenzuela also informed GEICO that LOSAT would now be filing suit against LNU and warned that LNU would now be exposed to an excess judgment as a result of GEICO's failure to properly comply with his settlement demand and warned GEICO that inclusion of Theresa Losat on the proposed release changed the entire case. (Doc. 72, Exhibit "FF").

At or about 11:30 a.m. on May 7, 2009, GEICO's F.R. delivered a revised release containing only Shawn Losat's name to Valenzuela's office. (Doc. 72, Exhibit "JJ"). Valenzuela refused to allow any of his staff to sign anything acknowledging that this document had been received. (Doc. 72, Exhibit "JJ"). Due to this issue, GEICO's F.R. faxed a copy of the release to Valenzuela before the deadline set forth in LOSAT's settlement demand passed. (Doc. 72, Exhibit "JJ"). Later this same day, Valenzuela faxed a response to GEICO's hand delivery reiterating his refusal to settle. (Doc. 72, Exhibit "KK"). On May 11, 2009, GEICO called LNU and advised him that LOSAT and his attorney had rejected his policy limit settlement. On May 13, 2009, GEICO sent a letter and called LNU to explain their efforts to settle his claim for his $20,000.00 policy limits. (Doc. 72, Exhibit "LL"). GEICO also informed LNU on this date that suit was imminent and that an attorney would be assigned to represent him. (Doc. 72, Exhibit "LL"). On July 7, 2009. GEICO sent a letter LNU advising him that the lawsuit against him had been served and defense counsel had been appointed. (Doc. 72, Exhibit "MM"). Additionally GEICO informed LNU of his right to obtain defense counsel at his own expense and the possibility of his interest being owed to LOSAT may exceed the $20,000.00 policy limit.

On May 13, 2009, LOSAT served a proposal for settlement in the amount of $2,005,385.38. (Doc. 72, Exhibit "NN"). LNU accepted LOSAT's proposal for settlement and a

judgment was entered against him on or about June 17, 2010. Subsequently, LOSAT has brought a civil action against GEICO for recovery of the amount that LNU owed LOSAT as a result of the judgment that was entered against LNU.

## STANDARD OF REVIEW

### Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248.

When a party fails to make a showing sufficient to establish the existence of an element to the party's case, and on which that party will bear the burden of proof at trial, there can be "no genuine issues as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all the other facts immaterial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. At 323. Summary judgment for the moving party should be granted when the evidence favoring the nonmoving party is "merely colorable... or is not significantly probative." Anderson, 477 U.S. at 249-50. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); citing Anderson, 477 U.S. at 252. In

ruling on state-law claims, such as the bad faith claim at dispute in the case at bar, the Court must follow state – that is, Florida – Law. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).

### The duty of good faith

1. The law of bad faith in Florida

The duty of "good faith" in Florida provides that insurers owe "a duty to their insureds to refrain from acting solely on the basis of their own interest in settlement." State Farm Mut. Auto Ins. Co. v. Laforest, 658 So.2d 55, 58 (Fla. 1995). The duty of good faith obligates an insurer to handle claims brought against its insureds with "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Boston Old Colony v. Gutierrez, 386 So.2d 783 (Fla. 1980). This duty obligates the insurer "to advise the insureds of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of excess judgment and to advise the insured of any steps he might take to avoid the same." Id. The "insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the totally recovery, would do so." Id. at 785. Failure to accept formal offers to settle by the claimant, or lack thereof, does not preclude a finding of bad faith against an insurer, but rather is just a factor to be considered when evaluating the insurers conduct. Id.; General Acc. Fire & Life Assur. Corp v. American Cas. Co., 390 So.2d 761, 765 (Fla. 3d DCA 1980).

Another important issue courts must consider is the role the insurer takes when defending the insured against a third party:

> An insurer who assumes the defense of the insured also assumes a duty to act in good faith and with due regard to the interests of the insured. More specifically, in actions by third parties against the insured, the insurer must act in good faith and be diligent in its effort to negotiate a settlement. The insurer breaches its duty if it fails

9

to act in good faith and the third party obtains a judgment against the insured for an amount in excess of the policy coverage

Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1064-1065 (11th Cir. Fla. 1996). An injured third party who has obtained an excess judgment against an insured may bring an action directly against an insurer who has breached its duty of good faith. Thompson v. Commercial Union Ins. Co. of N.Y., 250 So.2d 259 (Fla. 1971). The third-party's claim is not a separate cause of action but is solely derivative of the insured's claim and an insurer does not owe a duty of good faith directly to an injured third party. Fidelity & Cas. Co. of N.Y. v. Cope, 462 So.2d 459, 461 (Fla. 1985). Thus, an insurer may be held liable for an excess judgment against its insureds if, and only if, it has been found to have breached its duty of faith to its insured. Campbell v. Govt. Employees Ins. Co., 306 So.2d 525, 530-31 (Fla. 1974).

In insurance bad faith cases in Florida, a "totality of circumstances" test is used and the factors used in considering whether an insurer acted in bad faith will differ depending on the facts of each case. Williams v. Infinity Ins. Co., 745 So.2d 573 (Fla 5th DCA 1999). Although Florida law provides that the focus of a claim for bad faith should be on the conduct of the insurer, rather than the conduct of the claimant, the claimant's unwillingness to settle the claim is relevant to whether the insurer acted in bad faith under a totality of the circumstances and is a factor that must be considered. Barry v. Geico General Ins. Co., 938 So.2d 613 (Fla. 4th DCA 2006).

2. Summary judgment in bad faith cases

Summary Judgment in favor of an insurer in a bad faith action is appropriately granted when a court determines that no reasonable jury could conclude that the insurer acted in bad faith in its handling of the claim. Maldonado v. First Liberty Ins. Co., 342 Fed.Appx. 485 (11th Cir. 2009). In evaluating summary judgment motions in these cases, it has been held that to

constitute bad faith, the insurer's "conduct must evidence a conscious disregard or indifference to the rights of the insured." Francois v. Illinois Nat'l Ins. Co., 49 Fed.Appx. 290 (11th Cir. 2002). Another case stated that because of an "complete absence of evidence that [an insurer] acted solely on the basis of its own interests," the court found that summary judgment should be granted because "no reasonable jury could possibly find that [the insurer] acted in bad faith." Davidson, et. Al v. Govt. Employees Ins. Co., 2011 WL 1304723 (11th Cir. 2011). In Florida, where material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper. Berges v. Infinity Ins. Co., 896 So.2d 665, 680 (Fla. 2004).

## DISCUSSION

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if it is shown that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It follows that summary judgment in an insurer bad faith case is appropriately granted when a court determines that no reasonable jury could conclude that the insurer acted in bad faith in its handling of the claim. Maldonado v. First Liberty Ins. Co., 342 FedAppx 485 (11th Cir. 2009). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, an insurer can and will be held liable for damages above the contracted policy limits when that insurer is found to have handled a claim against its insured in bad faith and where material issues of fact, which would support a jury finding of bad faith, remain in dispute, summary judgment will not be granted. Berges v. Infinity Ins. Co., 896 So.2d 665, 680 (Fla. 2004). In the case at bar, taking the factors in the light most favorable to LOSAT, GEICO argues that they were not acting in bad faith and as a matter of law, and GEICO cannot be held liable for the excess judgment in this case.

Argument one: GEICO actions were not made in bad faith

GEICO contends that their actions in investigating the facts and considering the settlement offer were not unreasonable, and their attempt to settle was done in good faith in light of the insured paying the recovery in excess of his policy limit coverage. A review of the record shows that it is undisputed that GEICO tendered a policy limits check sixteen (16) days after the accident. Within twenty-four hours of discovering the identity and location of the claimant, GEICO tendered LNU's policy limit to LOSAT and five (5) days later tendered another policy limits check to LOSAT's attorney. It undisputed that LOSAT's attorney declined this first hand-delivered policy limits check, and as a result GEICO then immediately sent the check for the policy limits to LOSAT's attorney via certified mail. It is also undisputed that once GEICO learned of LOSAT's new attorney, GEICO then offered the policy limits check to LOSAT's new attorney. It is also undisputed that GEICO attempted to deliver another policy limits check to LOSAT's second attorney after a demand was received by GEICO. There are no facts that contradict or dispute these actions that GEICO made.

It is also undisputed that GEICO notified their insured of the ongoing situation with LOSAT. A review of the record shows that GEICO made at least fourteen (14) phone calls and sent at least six (6) letters to LNU from January 2009 and through July 2009. It is undisputed that GEICO advised LNU about the potential of litigation and their efforts to settle LOSAT's claim. It is also undisputed that GEICO advised LNU of the problems with settling LOSAT's claim and the possibility of LNU facing a judgment in excess of his policy limits contract. LNU was also copied on at least six (6) letters that were forwarded to LOSAT's attorneys and LNU was advised that hiring his own counsel might be in his best interest. There is no fact to contradict

that LNU was made fully aware of the situation with LOSAT and also kept up to date on any ongoing progress in attempting to settle the claim.

      Viewing the facts in the light most favorable to LOSAT, it is difficult to see how GEICO's repeated and diligent attempts to settle the claim were done in bad faith. In analyzing any insurance bad faith claim, the "totality of the circumstances" standard must be used. Looking to the insurer GEICO as the party to whom is evaluated, it is clear that GEICO did not act in self-interest nor did GEICO act in a manner outside of what a reasonable prudent business man would act under the circumstances. It is common place to have claimants who are unwilling to settle for various reasons; however as Florida law states:

> ...the focus of a claim for bad faith should be on the conduct of the insurer, rather than the conduct of the claimant, the claimant's unwillingness to settle the claim is relevant to whether the insurer acted in bad faith under a totality of the circumstances and is a factor that must be considered. Barry v. Geico General Ins. Co., 938 So.2d 613 (Fla. 4th DCA 2006).

Taking into account LOSAT's attorneys unwillingness to settle combined, with GEICO's constant attempts to achieve settlement, it is clear that no facts support any wrong doing on the part of GEICO. The law is also clear that to constitute bad faith, the insurer's "conduct must evidence a conscious disregard or indifference to the rights of the insured." Francois v. Illinois Nat'l Ins. Co., 49 Fed.Appx. 290 (11th Cir. 2002). The records reflects that GEICO sent numerous letters to LOSAT's attorneys and LNU, and GEICO repeatedly attempted to tender the policy limit check to LOSAT and his attorneys. All these facts show that there was a complete regard for LNU's rights and that GEICO acted in his best interests. Additionally, the mere fact that LOSAT was not willing to settle, despite the numerous attempts to communicate by any means possible with LOSAT's attorneys, does not even attempt to explain how GEICO's actions were in bad faith, even with viewing the facts in a light most favorable to LOSAT.

Case 8:10-cv-01564-EAK-TGW   Document 85   Filed 11/21/11   Page 14 of 19 PageID 2326

### Argument two: LOSAT's attorneys were unwilling to settle

GEICO argues that a review of the record will demonstrate that the reason this claim was not settled had nothing to do with GEICO, but rather was a choice made by LOSAT and his attorneys. It is undisputed that the record reflects that LOSAT was first represented by Attorney Brian Gonzalez, who soon after referred LOSAT to attorney Henry Valenzuela. It is also undisputed that the record shows that both attorneys were demonstrating an unwillingness to settle LOSAT's claim for LNU's policy limits of $20,000.00 The record also indicates that numerous phone calls, letters, and even hand delivered items were constantly refused or ignored by both attorneys. This conduct, taken in a light most favorable to LOSAT, clearly demonstrates that even if GEICO wanted to settle, it was clearly not an option.

GEICO also addresses the mistaken belief issue with Theresa Losat being identified as LOSAT's wife and subsequently placed on policy limit checks under that assumption. In GEICO's argument they believe that Valenzuela had imputed knowledge that Theresa Losat was not LOSAT's wife and failed to inform GEICO of this until after the demand for settlement agreement was sent to GEICO. GEICO relies on this belief arguing the facts show that under the previous checks issued to LOSAT and his first attorney Gonzalez Theresa Losat was listed as "wife." There were also numerous references to Theresa Losat as LOSAT's "wife" in the letters GEICO sent to both attorneys. GEICO argues that Valenzuela must have had to learn this fact while reviewing all the files in order to properly represent LOSAT. GEICO summarily believes that Valenzuela must have come across this issue in either the files from LOSAT's first attorney or during the course of representing LOSAT thereafter. This argument is persuasive because a reasonable prudent attorney would have discovered this in the process of representation and attempting to settle an insurance claim for a client.

GEICO further argues that they were not negligent in the Theresa Losat issue. LOSAT contends in his reply that GEICO was negligent in placing Theresa Losat on the settlement check and also requesting a waiver from her for any claims as LOSAT's wife. At first glance, this argument appears to have merit; however a review of the facts clearly establish GEICO attempted to correct this mistake and was not acting in bad faith when they did so. Not only did GEICO send multiple letters stating they would be willing to reissue another check in another fashion as to whom it was made out to, but GEICO did this with both attorneys. The very last time GEICO offered to issue another check occurred after Valenzuela declined GEICO's settlement check on May 6, 2009. Valenzuela stated that because GEICO included LOSAT's mother as his wife in the settlement check and request of waiver, Valenzuela could no longer accept any settlement checks and accused GEICO of acting in bad faith. Despite GEICO attempting to tender another check in the fashion Valenzuela explained, Valenzuela took the position that this was now a dead offer because the act of tendering a check not meeting the specified requirements of the settlement agreement constituted a counteroffer. Although viewing these facts in light most favorable to LOSAT, this argument still fails.

Valenzuela argues the correct law in his reply, that such a tender by GEICO could be a counter-offer under contract law. However, Valenzuela fails to address that such mistakes in contracts, when made, are often fixable by the parties. Not only does Valenzuela refuse to accept GEICO's two subsequent separate attempts to remedy this problem before the deadline comes, but Valenzuela warns GEICO in a fax that because of this omission that GEICO acted in bad faith. The facts could be argued in favor of LOSAT in regards to whether it was more than mere negligence on the part of GEICO for mistakenly identifying LOSAT's mother as his wife;

however, even with stating GEICO was negligent in this regard, it does not establish they acted in bad faith.

The law states that negligence is a factor to be considered under the totality of the circumstances in evaluating bad faith claims. Boston Old Colony v. Gutierrez, 386 So.2d 783, 785 (Fla. 1980). The law also clearly states that bad faith is more than mere negligence. Campbell v. Govt. Employees Ins. Co., 306 So.2d 525, 530-31 (Fla. 1974). It follows that an insurer who is only negligent in its handling of an insured's claim, without more facts, does not rise to the bad faith standard and as a result cannot be held liable for an excess judgment. Gutierrez, 386 So.2d 783, 680 (Fla. 1980). Taking the facts of GEICO's mistaken belief in whom Theresa Losat was to LOSAT in a light most favorable to LOSAT, this argument combined with the totality of the circumstances does not establish GEICO acted in bad faith. It is also clear that no reasonable jury could find that GEICO acted in bad faith in attempting to settle LOSAT's claim.

### Argument three: GEICO reasonably attempted to meet the terms and conditions of LOSAT's settlement demand

LOSAT claims that GEICO was acting in bad faith when it failed to meet the terms of Valenzuela's demand letter dated April 28, 2009. GEICO contends that the failure to meet the settlement demand is explained by the actions of LOSAT's attorneys. GEICO explains that even if they were negligent in addressing Theresa Losat as LOSAT's wife, it is not an action that shows bad faith. GEICO contends that, acting under the belief that Theresa Losat was LOSAT's wife, GEICO was attempting to protect LNU from multiple judgments arising out of the same vehicular accident. This argument has merit, as it is custom for GEICO to have wives of claimants sign off on waivers. Disregarding GEICO's policy, GEICO clearly offered to take Theresa Losat out completely once Valenzuela informed GEICO who Theresa Losat was.

Thereafter it was Valenzuela who refused to accept the settlement agreement and who also accused GEICO of bad faith for mistakenly placing her on the settlement agreement. The facts are undisputed that GEICO attempted to settle LOSAT's claim, and it ultimately refused by LOSAT's attorney.

GEICO next contends that even though LOSAT argues that the settlement agreement had three explicit conditions, the only reason GEICO was found to not have met them was due to Valenzuela not allowing GEICO to do so. In the facts it is clear that prior to May 4, 2009, GEICO was clearly unaware Theresa Losat was LOSAT's mother, not his wife. It is also clear that LOSAT's attorney did not inform GEICO of this misunderstanding until May 4, 2009, regardless of when Valenzuela was truly aware of this fact. It is clear that when GEICO became aware of Theresa Losat being LOSAT's mother, GEICO promptly offered and then delivered the settlement check combined with additional pertinent documents to settle the claim. Taking these facts in the light most favorable to LOSAT, if LOSAT's attorney had any intention of settling this claim, there was ample time to do so and the record reflects GEICO made the appropriate actions to meet the demands of the settlement agreement. Additionally the record reflects that GEICO did not attempt to negotiate any of the terms; rather once their mistake was made aware to them by LOSAT's attorney, they attempted to deliver the settlement agreement without any conditions to the contrary. It is clear that the inference of GEICO's mistake combined with the unwillingness of LOSAT's attorney to settle establish GEICO has not acted in bad faith when attempting to meet the demands of the settlement agreement.

<u>Argument four: LOSAT's attorneys were unwilling to settle the claim for the policy limits</u>

GEICO contends that the record reflects that all of their attempts to clarify or communicate a settlement agreement with LOSAT were blocked by his attorneys. GEICO argues

17

that taking Valenzuela's statements combined with the overall refusal of communicating over the history of attempting to settle LOSAT's claim, establishes that LOSAT's attorneys were unwilling to settle and it could be inferred they did not act reasonable in light of the circumstances. Reviewing the record, it shows that not only was Gonzalez unwilling to accept any documents from GEICO, but he also instructed his staff to do the same. Valenzuela did this too once he took over representation. Reviewing the record, it is also undisputed that Gonzalez and Valenzuela both requested ambiguous items, for which GEICO attempted to get clarification on, but Valenzuela also ignored phone calls, letters and refused to accept documents at his office, including multiple settlement agreement checks for the policy limits.

Although strategy and tactics each attorney chooses are of personal professional preference and not to be deemed unethical behavior, the refusal to communicate and failure to respond combined with an argument that the other party, for whom you are ignoring, did not attempt to settle in good faith is a completely different issue all together. Valenzuela and Gonzalez in their demands and reply letters continuously and throughout the time that settlement was pending, were evasive and ambiguous in whether they were willing to settle. The record reflects that LOSAT's first attorney, Gonzalez, even admits in his deposition that he "never engaged in… efforts to settle the case on Mr. Losat's behalf." (Doc. 72 Exhibit "RR"). Attorney Valenzuela was equally problematic from time he took over LOSAT's claim up until May 7, 2009, where he warned GEICO of his intentions to pursue his bad faith claims because of their mistake in not discovering that Theresa Losat was LOSAT's mother and not his wife.

Taking all of LOSAT's and GEICO's arguments into account with the facts and totality of the circumstances of this case, it would be difficult, if not impossible to find that GEICO acted in any other manner than in good faith. Viewing all the disputed facts in a light most favorable to

LOSAT, it does nothing to help suggest an argument for bad faith worth pursuing in court. There has been no factual support brought forth to establish that GEICO's conduct evidenced a conscious disregard or indifference to the rights of LNU. Because there is a complete absence of evidence that GEICO acted solely on the basis of its own interests and not for LNU's claim, this court finds that no reasonable jury could possibly find that GEICO acted in bad faith.

Accordingly it is:

**ORDERED** that Geico Casualty Company's Federal Rule of Civil Procedure 56(c) Motion for Summary Judgment (Doc. 72) be **GRANTED**. The Clerk of Court Shall enter judgment for the Defendant and against the Plaintiffs and shall close this case.

**DONE AND ORDERED** in Chambers at Tampa, Florida, this 21 day of November, 2011.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT COURT JUDGE

Copies to: All parties and counsel of record